## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO
### Judge Robert E. Blackburn

Civil Case No. 11-cv-02603-REB-KMT

DAVID C. ROSS,

     Plaintiff,

v.

COLORADO DEPARTMENT OF TRANSPORTATION,

     Defendant.

---

## ORDER

---

**Blackburn, J.**

     The matter before is **Defendant's Memorandum Brief in Support of**

**Combined Motion To Dismiss and Motion for Summary Judgment** [#19],[1] filed June

29, 2012.  I grant the motion for summary judgment[2] and order further briefing on the

issues implicated by the motion to dismiss for lack of subject matter jurisdiction

### I.  JURISDICTION

     I have jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 (federal

question) & 1367 (pendant state law claims).

### II.  STANDARD OF REVIEW

---

[1] "[#19]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF).  I use this convention throughout this order.

[2] The issues raised by and inherent to the motion for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motion stands submitted on the briefs. *Cf.* **FED. R. CIV. P. 56(c)** and **(d)**. *Geear v. Boulder Cmty. Hosp.,* 844 F.2d 764, 766 (10th Cir.1988) (holding that hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

Federal courts are courts of limited jurisdiction and thus may only adjudicate claims that the Constitution or Congress have given them authority to hear and determine.  ***Morris v. City of Hobart***, 39 F.3d 1105, 1110 (10th Cir. 1994), ***cert. denied***, 115 S.Ct. 1960 (1995); ***Fritz***, 223 F.Supp.2d at 1199 (D. Colo. 2002). A motion alleging immunity from suit implicates the court's subject matter jurisdiction and therefore is analyzed under Fed. R. Civ. P. 12(b)(1).  ***See Neiberger v. Hawkins***, 150 F.Supp.2d 1118, 1120 (D. Colo. 2001).

A motion to dismiss under Rule 12(b)(1) may consist of either a facial or a factual attack on the complaint.  ***Holt v. United States***, 46 F.3d 1000, 1002 (10th Cir. 1995). Because defendant's motion presents a facial attack, I must accept the allegations of the complaint as true.  ***Id***.  Nevertheless, the motion "'must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction.'"  ***Fritz v. Colorado***, 223 F.Supp.2d 1197, 1199 (D. Colo. 2002) (quoting ***Groundhog v. Keeler***, 442 F.2d 674, 677 (10th Cir. 1971)).  Plaintiff bears the burden to establish that subject matter jurisdiction exists.  ***Henry v. Office of Thrift Supervision***, 43 F.3d 507, 512 (10th Cir. 1994); ***Fritz***, 223 F.Supp.2d at 1199.

Summary judgment is proper when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  **FED. R. CIV. P.** 56(c); ***Celotex Corp. v. Catrett***, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).  A dispute is "genuine" if the issue could be resolved in favor of either party. ***Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.***, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); ***Farthing v. City of Shawnee***, 39 F.3d

2

1131, 1135 (10th Cir. 1994).  A fact is "material" if it might reasonably affect the outcome

of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505,

2510, 91 L.Ed.2d 202 (1986); *Farthing*, 39 F.3d at 1134.

A party who does not have the burden of proof at trial must show the absence of

a genuine fact issue.  *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d

1513, 1517 (10th Cir. 1994), *cert. denied*, 115 S.Ct. 1315 (1995).  Once the motion has

been properly supported, the burden shifts to the nonmovant to show, by tendering

depositions, affidavits, and other competent evidence, that summary judgment is not

proper.  *Id.* at 1518.  All the evidence must be viewed in the light most favorable to the

party opposing the motion.  *Simms v. Oklahoma ex rel. Department of Mental Health*

*and Substance Abuse Services*, 165 F.3d 1321, 1326 (10th Cir.), *cert. denied*, 120

S.Ct. 53 (1999).  However, conclusory statements and testimony based merely on

conjecture or subjective belief are not competent summary judgment evidence.  *Rice v.*

*United States*, 166 F.3d 1088, 1092 (10th Cir.), *cert. denied*, 120 S.Ct. 334 (1999).

### III.  ANALYSIS

Plaintiff is employed by the Colorado Department of Transportation ("CDOT") as

an Administrative Assistant III in the Staff Bridge Unit.  Plaintiff's job duties include

managing, planning, scheduling, and organizing official functions and special training

events for the Unit.  Plaintiff, a devout Christian, claims that defendant has

discriminated, harassed, and retaliated against him on the basis of his religious faith.

On August 11, 2010, plaintiff was present at a meeting of Staff Bridge Unit

Leaders at which the annual employee appreciation luncheon was discussed.  During

the meeting, Behrooz Far noted that the luncheon was scheduled during the observance of Ramadan and requested that the luncheon be rescheduled so that one of his subordinate employees, Ali Harajli, an observant Muslim, could attend.  An alternative date was proposed, and plaintiff's direct supervisor, Staff Bridge Engineer Mark Leonard, approved the change of date and asked plaintiff to notify employees of the change.  Although plaintiff objected to the change of date, he did not tell anyone of the reasons for his opposition.

One week later, it came to Mr. Leonard's attention that employees had not been notified of the change of date for the luncheon, and he asked plaintiff to do so as soon as possible.  Plaintiff told Mr. Leonard that he would need to hand off responsibilities for advertising the luncheon to another administrative assistant, Lynn Armendariz, because he "would not be at the event, [he] would be out" for "personal reasons" that he "would explain . . . later."  (**Plf. Resp. App.**, Exh. B at 91.)  Mr. Leonard asked plaintiff to perform his normal responsibilities in the interim and send the email.  Plaintiff subsequently sent out an email which stated, in relevant part: "This event is being re-scheduled to Monday, September 13, at the request of Ali, so he may participate."  (**Def. Motion App.**, Exh. 5.)

Plaintiff met with Mr. Leonard on August 24 and for the first time specified that rescheduling the luncheon was contrary to his religious beliefs.  He asked to be relieved of his responsibilities for coordinating the event.  Mr. Leonard agreed, but expressed concern that plaintiff's September 13 email had unfairly singled out Mr. Harajli.  He asked plaintiff to consider revising the notice to indicate that it had been Mr. Leonard's

4

decision to reschedule the event in order to "honor[] . . . Ramadan[.]"  (**Plf. Resp. App.**, Exh. B at 108.)  The luncheon subsequently went forward as rescheduled.  Plaintiff did not attend.

On September 22, 2010, Mr. Harajli sent an email to plaintiff and Ms. Armendariz, asking them to forward an invitation to Staff Bridge Unit employees to have bagels and cream cheese "[o]n behalf of our fellow employees who are celebrating the end of the Month of fasting (Month of Ramadan) this year[.]"  (**Def. Motion App.** Exh. 6.)  Plaintiff refused to forward the invitation.  Nevertheless, Mr. Leonard approved the invitation and asked another employee, Mahmood Hasan, to send it out.  (**See id.**, Exh. 7.)

The following week, plaintiff met with Mr. Leonard to express his belief that rescheduling the employee appreciation luncheon was "seriously inappropriate" and violated the First Amendment by "establishing that Ramadan was the top religion in Staff Bridge," "this grand holiday that no events could be scheduled during."  (**Plf. Resp. App.**, Exh. B at 105-107.)  Plaintiff further characterized Mr. Harajli's September 22 email invitation as "proselytizing" and "promoting Islam in the workplace."  (**Id.**, Exh. B at 139.)  Plaintiff requested an informal resolution of his concerns, and Mr. Leonard provided a written response several weeks later.[3]

_____

[3]  In an email to plaintiff, Mr. Leonard stated that "it has been the Branch's practice to accommodate cultural diversity for employee events where practical, appropriate, and consistent with the purpose of the event" and that CDOT's human resources and EEO departments had confirmed that such accommodations were acceptable and could continue.  Likewise, Mr. Leonard confirmed that allowing employees to provide refreshments in recognition of the end of Ramadan was an acceptable activity and that the advertisement of staff employee appreciation events, including cultural appreciation events, was an appropriate use of department email.  He concluded by requesting that plaintiff "help the Department provide an environment that is respectful of cultural diversity" and, to that end, "not pursue [his] concerns about religious practices during working hours" except through human resources or the EEO office.  (**Def.**

The following September, Mr. Hasan sent an email to Staff Bridge Unit

employees indicating that bagels would be available in the cafeteria the following

morning to mark the end of Ramadan.  Plaintiff responded with his own email:

> I am unable to attend the Religious Cultural Celebration
> marking the End of Ramadan, because my Faith will not
> allow it, and I also know of other members of Staff Bridge
> who will not be attending.
>
> Therefore, in keeping with the universal tradition of sharing
> food as a sign of friendship, I and others have provided
> some morning snacks in the Coffee/Break room for everyone
> to enjoy.

(**Def. Motion App.**, Exh. 9 at 2-3.)  This prompted Mr. Harajli to respond "[f]eel free not

to attend if your faith prohibits you from sharing goodies provided by fellow employees

in celebrating their holiday.  We do not have any sensitivity regarding participating in

occasions celebrated by others."  (**Id.**)  After this email string was forwarded by another

employee to the Branch Manager for CDOT's Center for Equal Opportunity, she, Mr.

Leonard, and others decided that human resources would alert employees that hosting

activities with specific religious connotations was considered inappropriate.  (**Plf. Resp.**

**App.**, Exhs. F & G.)[4]

On November 16, 2011, Mr. Harajli sent another email to the Staff Bridge Unit

inviting them to share bagels and cream cheese "[a]s part of our annual treat to staff

---

**Motion App.**, Exh. 4 at 3.)

    [4]  The employee expressed concern that the exchange between plaintiff and Mr. Harajli was
indicative of "something unpleasant going on in Staff Bridge today (and apparently ongoing)" and asking
for a meeting because "I know that this communication is not acceptable, but I'm not sure what to do about
it."  (**Def. Motion App.**, Exh. 9 at 1.)

Bridge." (**Def. Motion App.**, Exh. 11.)  Although the email did not mention Eid,[5] plaintiff

responded by asking Mr. Harajli to "[p]lease correct your request to reflect the subject of

your attached emails, as the subject listed appears deceptive," and copied Scott

McDaniel, Mr. Leonard's supervisor.  (*Id.*, Exh. 12.)  When plaintiff did not hear back

from Mr. McDaniel immediately, he sent a follow-up email, complaining

> about Ali's deceptive "meeting," and emails (attached)
> regarding an [*sic*] non-specific "annual treat," that appears to
> be another example of his ongoing promotion of his faith,
> during working hours, and utilizing a CDOT conference room
> . . . as well as using broadcast emails.  I easily looked up
> some information on-line, and this event appears to coincide
> with the second Islamic religious EID [*sic*] celebration, and
> as their only "annual" event in the past has been the EID
> [*sic*] celebration after Ramadan, this is a new expansion of
> their promotion of Islamic religious practices. . . .
>
> . . . .
>
> Why is CDOT allowing these obviously deceptive workplace
> manipulations, in order to indoctrinate non-Muslims into the
> religious customs of Islam, during scheduled working hours,
> and tying up CDOT resources with false pretenses?

(*Id.*, Exh. 13 at 3.)  When Mr. McDaniel responded that he saw no evidence that the

gathering constituted an effort to promote religion, plaintiff responded that "this

methodology to promote Islam has been common for well over 1000 years, and any

organization briefed by Homeland Security is aware of these subtle yet pervasive

methods."  Mr. McDaniel indicated his disagreement with plaintiff's assessment of the

---

[5]  Muslims celebrate two Eids each year.  Eid al-Fitr marks the end of Ramadan, the month of
fasting.  Eid al-Adha commemorates the completion of the Hajj pilgrimage to Mecca.  (*See What is Eid?*
(available at http://www.whatiseid.com/) (last accessed October 25, 2012.)  In 2011, Eid al-Fitr fell on
Tuesday, August 30, and Eid al-Adha fell on Sunday, November 6.  (*See When is Eid al-Fitr in 2011?* and
*When is Eid al-Adha in 2011?*, When-is (available at http://www.when-is.com/eid-al-fitr-2011.asp) and
http://www.when-is.com/eid-al-adha-2011.asp) (last accessed October 25, 2012).

situation, noting that there was no evidence that Mr. Harajli was acting on behalf of any organized group and declining to investigate further.  (*Id.* at 2.)

In his charge of discrimination, plaintiff complained that Mr. Leonard had intentionally scheduled events around Ramadan but not other religious holidays and that his job duties required him to explain that practice to other employees.  He further claimed that Mr. Leonard allowed Muslims to engage in "overt public religious displays" in the office while not affording similar accommodation to non-Muslims.[6]  In sum, plaintiff believed that CDOT was "overly accommodating to Muslim proselytization and practices in the workplace, but is not accommodating other religious practices in the workplace." (*Id.*, Exh. 8.)

In this lawsuit, plaintiff brings claims under Title VII for hostile work environment, failure to accommodate, disparate treatment, and retaliation.  He also brings claims under 42 U.S.C. § 1983 for alleged violation of the Free Speech, Free Exercise, and Establishment Clauses of the First Amendment, and a claim for unlawful discrimination under Colorado state law.  Defendant seeks to dismiss the latter group of claims as barred by the Eleventh Amendment.  It seeks summary judgment on the Title VII claims.

### A.  MOTION TO DISMISS – ELEVENTH AMENDMENT IMMUNITY

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be
> construed to extend to any suit in law or equity, commenced

---

[6]  In his deposition, plaintiff clarified that this charge related to Mr. Harajli observing prayer rituals in his cubicle, speaking in Arabic, and displaying Islamic religious icons, prayers, and Arabic writing in his cubicle.  (**Plf. Resp. App.**, Exh. N at 2.)

> or prosecuted against one of the United States by Citizens of
> another State, or by Citizens or Subjects of any Foreign
> State.

**U.S. CONST.**, amend. XI.  Despite its literal terms, the amendment's reach has been

extended to encompass suits brought by citizens against their own states.  ***Board of***

***Trustees of the University of Alabama v. Garrett***, 531 U.S. 356, 363, 121 S.Ct. 955,

962, 148 L.Ed.2d 866 (2001); ***Kimel v. Florida Board of Regents***, 528 U.S. 62, 72-73,

120 S.Ct.  631, 640, 145 L.Ed.2d 522 (2000).  "The ultimate guarantee of the Eleventh

Amendment is that nonconsenting States may not be sued by private individuals in

federal court."  ***Garrett***, 121 S.Ct. at 962.[7]

This protection extends to "arms" of the state.  ***See Ruiz v. McDonnell***, 299 F.3d

1173, 1180 (10th Cir. 2002), ***cert. denied***, 123 S.Ct. 1908 (2003); ***Sturdevant v.***

***Paulsen***, 218 F.3d 1160, 1164 (10th Cir. 2000).  Whether the defendant is an arm of the

state"must be determined in each case by reference to the particular state laws

characterizing the entity."  ***Sturdevant***, 218 F.3d at 1164.  This determination includes

two steps:

> [T]he court first examines the degree of autonomy given to the
> agency, as determined by the characterization of the agency by
> state law and the extent of guidance and control exercised by the
> state.  Second, the court examines the extent of financing the
> agency receives independent of the state treasury and its ability to
> provide for its own financing.  The governmental entity is immune

---

[7] Plaintiff also argues that he should be allowed to add Mr. Leonard as a party defendant in order to invoke the ***Ex Parte Young*** fiction and sue for prospective and injunctive relief.  ***See Ex Parte Young***, 209 U.S. 123, 160, 28 S.Ct. 441, 454, 52 L.Ed. 714 (1908).  ***See also Hill v. Kemp***, 478 F.3d 1236, 1256 (10th Cir. 2007) ("***Young*** proceeds on the admitted fiction that a suit seeking an injunction against a state employee seeking to do his or her job is (somehow) different in substance than a suit against the state itself. "), ***cert. denied***, 128 S.Ct. 873 (2008), ***and cert. denied***, 128 S.Ct. 884 (2008).  Plaintiff filed a separate motion seeking leave to amend his complaint on this same basis, and I will address his arguments in this regard in the context of resolving that motion.

> from suit if the money judgment sought is to be satisfied out of the
> state treasury.

***Watson v. University of Utah Medical Center***, 75 F.3d 569, 574-75 (10th Cir. 1996)

(citations and internal quotation marks omitted).  Although the issue has not been

addressed squarely in the Tenth Circuit, it appears that it is defendant's burden to prove

its status as an arm of the state.  ***See Thomas v. Guffy***, 2008 WL 2884368 at * 4 & nn.

1-4 (W.D. Okla. July 25, 2008).[8]

Defendant has not met this burden on the record before me.[9]  With respect to the

first relevant inquiry, defendant argues that it is a "principal department" of the state of

Colorado.  ***See Sturdevant***, 218 F.3d at 1166 (noting among other relevant factors to

arm-of-the-state analysis "the characterization of the governmental unit under state law").

The current Department of Transportation was created pursuant to the authority of the

Administrative Organization Act of 1968, §§24-1-101 – 24-1-137, C.R.S.  ***See***

§24-1-128.7, C.R.S.  One of the purposes of that statute was "to effect the grouping of

state agencies into a limited number of principal departments primarily according to

function." §24-1-101, C.R.S.  However, defendant fails to elaborate what this

characterization portends in relevant context.  ***Cf. Sturdevant***, 218 F.3d at 1167

(considering Eleventh Amendment implications of characterizations of entity as "body

corporate" and "political subdivision" of the state).  Its failure to more fully flesh out the

ramifications of this designation in terms of "the extent of guidance and control exercised

---

[8]  Defendant cites no case, and I have found none, addressing the issue whether the Colorado
Department of Transportation is an arm of the state.

[9]  Defendant did not address this issue in its original motion, but only in reply to plaintiff's response
to the motion to dismiss.

by the state" makes it difficult to appropriately analyze the issue.

Defendant's argument that any recovery against it will come out of Colorado's risk management fund, *see* §24-30-1510(3)(a), C.R.S., does not go far enough, either.  The Tenth Circuit has found that

> for purposes of the federal constitutional question, it is not at all clear that even if a risk management fund must pay a judgment, this obligation renders that judgment a judgment against the state for Eleventh Amendment purposes.  The key question is whether funds to satisfy a money judgment would come directly from the state, or indirectly through commingled state and local funds or state indemnification provisions.

*Sturdevant*, 218 F.3d at 1165 (citation and internal quotation marks omitted; emphasis omitted).  In other words, the more salient inquiry is who will be legally liable for the judgment, rather than whether the state's treasury will be impacted, either directly or indirectly.  *See Duke v. Grady Municipal Schools*, 127 F.3d 972, 981 (10th Cir. 1997) (holding that school board was not arm of the state under New Mexico law because its insurance carrier, not state, was legally obligated to pay any judgment against the board).  Although other relevant factors may make analysis of the impact on the state treasury less central, *see Sturdevant*, 218 F.3d at 1166, defendant has addressed none of these.

Thus, I find that these important issues have not been adequately addressed in the current briefing and would benefit from further development.  I therefore will provide the parties with an additional opportunity to submit supplemental briefs limited to this

discrete issue.[10]

## B. MOTION FOR SUMMARY JUDGMENT – TITLE VII CLAIMS

Plaintiff alleges causes of action under Title VII for hostile work environment harassment, failure to accommodate, disparate treatment, and retaliation. I consider these claims in turn.

## 1. HOSTILE WORK ENVIRONMENT

Plaintiff asserts that he was subjected to a religiously hostile work environment in

---

[10] I note, however, that if defendant is, in fact, an arm of the state, it is clear that it has not waived its immunity, as plaintiff argues. Sovereign immunity may be circumvented only when Congress has abrogated it or when the state itself has consented to be sued. *Ruiz*, 299 F.3d at 1181. In either case, the test for finding waiver is stringent. Congress may abrogate sovereign immunity only when it both unequivocally states its intention to do so and acts pursuant to a valid grant of constitutional authority. *Garrett*, 121 S.Ct. at 962. A state will be found to have consented to suit only when the intention to waive immunity has been made apparent "'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (citation omitted; alteration in original).

Neither of those circumstances pertain here. It is clear, and plaintiff does not assert otherwise, that Congress has not abrogated states' sovereign immunity with respect to section 1983 claims implicating the First Amendment. *See Will v. Michigan Department of State Police*, 491 U.S. 58, 66, 109 S.Ct. 2304 2309-10, 105 L.Ed.2d 45 (1989).

Nor has defendant waived that immunity by its actions in this lawsuit. Defendant asserted the defense of lack of subject matter jurisdiction in its answer to the complaint, both in response to plaintiff's assertion of federal jurisdiction and as an affirmative defense to his claims. *Cf. Cisneros v. Wilson*, 226 F.3d 1113, 1118 (10th Cir. 2000) (filing of motion to dismiss that did not include defense of Eleventh Amendment immunity did not constitute waiver of immunity), *overruled on other grounds as recognized in Ferguson v. Oklahoma Secretary of State*, 6 Fed. Appx. 797, 798 (10th Cir. April 3, 2001). The assertion of Eleventh Amendment immunity can be raised at any point in the proceedings. *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 99 n. 8, 104 S.Ct. 900, 907 n.8, 79 L.Ed.2d 67 (1984). It cannot be waived by merely appearing in and litigating in a case "absent some extraordinarily effective waiver." *Richins v. Industrial Construction, Inc.*, 502 F.2d 1051, 1056 (10th Cir. 1974). *See also De Leon Lopez v. Corporacion Insular de Seguros*, 931 F.2d 116, 121 (1st Cir.1991) ("[T]he salience of the provision overrides ordinary notions of procedural default[.']"). Contrary to the precedents relied on by plaintiff, this is not a case in which the state "becomes the actor and files a claim against the fund, [and thus] waives any immunity it otherwise might have had respecting the adjudication of the claims." *Gardner v. New Jersey*, 329 U.S. 565, 574, 67 S.Ct. 467, 472, 91 L.Ed. 504 (1947). *Cf. Sutton v. Utah State School for the Deaf and Blind*, 173 F.3d 1226, 1235-36 (10th Cir. 1999) (finding "extraordinarily effective waiver" where state Attorney General removed suit, as to which state law provided exclusive jurisdiction in the state courts, to federal court and litigated case on merits, raising waiver only at oral argument on appeal).

that defendant permitted and promoted Muslim religious observances and traditions, rather than maintaining a religiously neutral work environment.  A hostile work environment claim requires proof sufficient for a "rational jury [to] find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *MacKenzie v. City and County of Denver*, 414 F.3d 1266, 1280 (10th Cir. 2005) (citations and internal quotation marks omitted; alterations in original).  This standard is designed to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of [religious] jokes, and occasional teasing," and thus to prevent Title VII from becoming "trivialized as a civility code."  *Id.*  Whether this standard is met requires consideration of the totality of the circumstances, including: "(1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance."  *Id.*

In addition, the environment must be both subjectively and objectively hostile or abusive.  *Id.*  Subjectively, although plaintiff need not demonstrate that the work environment "seriously affected [his] psychological well-being or that it tangibly impaired [his] work performance," *Davis v. United States Postal Service*, 142 F.3d 1334, 1341 (10th Cir. 1998),"if [he] does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation," *Harris v. Forklift Systems, Inc*., 510 U.S. 17, 21-22, 114 S.Ct.

13

367, 370, 126 L.Ed.2d 295 (1993).  The objective inquiry "requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.  Conduct which is considered normal and appropriate in one setting may be deemed abusive or hostile in another."  *Morris v. City of Colorado Springs*, 666 F.3d 654, 664-65 (10th Cir. 2012) (citations and internal quotation marks omitted).

There is no question but that plaintiff subjectively was offended by defendant's agreement to reschedule the 2010 employee appreciation luncheon to allow those who observed the fast of Ramadan to participate, as well as by defendant's agreement to facilitate the publication of Muslim employees' invitations to the bagel breakfasts and its accommodation of Mr. Harajli's religious practices.  Plaintiff plainly believed that these actions condoned religious proselytizing of Islam in the workplace and found such actions offensive to his own religious beliefs.

Objectively, however, the evidence, viewed in the light most favorable to plaintiff, does not support a conclusion that a reasonable person could view these events, singly or in combination, as sufficiently severe or pervasive so as to create a religiously hostile or abusive working environment.  Plaintiff does not suggest, and there is no evidence, that anyone at CDOT ever disparaged Christianity generally or him personally because of his religious beliefs.[11]  The events surrounding the 2010 employee appreciation luncheon occurred within a discrete and relatively brief period of time.  The three invitations to share bagels in recognition of Eid occurred in September 2010, September 2011, and November 2011.  *See Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1417-18

_____

[11] Plaintiff testified that he recalled a few jokes, but that  they did not offend him, and they are not specified on the record before me.

(10th Cir. 1987) (plaintiff must show "more than a few isolated incidents of [religious] enmity") (citation and internal quotation marks omitted).  There is nothing in the evidence of other events or incidents in the year-long interim in between.   In other words, there is no evidence suggesting that plaintiff was subjected to a constant barrage of references to Islam or requests to accommodate Muslim employees' religious beliefs.[12]

However, plaintiff also alleges that he "was subject to scrutiny from his boss, disfavored treatment, a change in his duties, decrease in his security level, had his safety threatened, was watched, humiliated and belittled by his co-workers, and had discipline contemplated against him, all of which negatively impacted his ability to perform his job."  (**Plf. Resp.** at 13-14.)[13]  What scant actual evidence there is to support these conclusory contentions fails to demonstrate the type of severe or pervasive behavior that could objectively be thought to have altered plaintiff's working conditions. *See MacKenzie*, 414 F.3d at 1280.

For example, plaintiff points to an unsigned document, which I surmise was

---

[12]  Although plaintiff also complains of Mr. Harajli's in-office prayers (which I infer occurred at least once a day) and display of various religious icons, there is no evidence to support the notion that, by proximity or inability to otherwise avoid Mr. Harajli's cubicle, plaintiff was routinely left with no alternative but to witness Mr. Harajli's silent prayers.

[13]  Plaintiff suggests that "[e]vidence of hostile work environment is [set] forth in Plaintiff's discovery response" (**Plf. Resp.** ¶ 14 at 6), but fails to direct the court to that evidence, which response is not appended to his response to the motion.  The court is neither required nor inclined to scour the record in search of evidence in support of plaintiff's claims, *see Gross v. Burggraf Construction Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) ("Judges are not like pigs, hunting for truffles buried in briefs.") (citation and internal quotation marks omitted), nor to make arguments on his behalf, *see Center for Biological Diversity v. Pizarchik*, 858 F.Supp.2d 1221, 1230 n.11 (D. Colo. 2012).  Nevertheless, having reviewed plaintiff's responses to interrogatories, which are appended to defendant's motion (*see* **Def. Motion App.**, Exh. 14), I find merely the same conclusory, unsubstantiated allegations of allegedly adverse consequences as are set forth in plaintiff's response to the motion for summary judgment.

authored by Mr. Leonard, which document purports to be "a typed summary of my handwritten notes and otherwise undocumented memories to help me organize events" surrounding the rescheduling of the 2010 employee luncheon and interpersonal friction plaintiff was experiencing with two of his co-workers during that same time frame. (*See* **Plf. Resp. App.** Exh. K.)  To the extent a reasonable person could view these notes as indicating that plaintiff's supervisor was scrutinizing him more intensely than he otherwise would, again, such scrutiny was confined to the relatively brief period of time surrounding the date of the luncheon and was directly related to plaintiff's complaints about the rescheduling of that event. Nor is there any evidence that plaintiff was contemporaneously aware of any such increased scrutiny or that it included matters not properly within the scope of Mr. Leonard's duties as plaintiff's supervisor.

These notes further document a handful of unpleasant interactions between plaintiff and two particular co-workers.  Yet plaintiff has failed to present any evidence suggesting that these events were motivated by religious, as opposed to merely personal, animosity.  ***See Bolden v. PRC Inc.***, 43 F.3d 545, 551 (10th Cir. 1994), ***cert. denied***, 116 S.Ct. 92 (1995); ***Klen v. Colorado State Board of Agriculture***, 2007 WL 2022061 at *19 (D. Colo. July 9, 2007).  ***See also Haugerud v. Amery School District***, 259 F.3d 678, 692 (7th Cir. 2001) (noting that question whether environment is hostile "turns on whether the alleged harassment occurred *because of* the [religion] of the defendant") (emphasis added).  At best, plaintiff's evidence shows nothing more than "the run-of-the-mill . . . annoying behavior that is not uncommon in American workplaces," but which "is not the stuff of a Title VII hostile work environment claim."

16

*Morris v. City of Colorado Springs*, 666 F.3d 654, 664 (10th Cir. 2012).  ***See also***

***Rosario Rivera v. Puerto Rico Aqueduct and Sewers***, 331 F.3d 183, 191 (1st Cir.

2003) (co-workers' religiously tinged responses to plaintiff's chiding them for their

unprofessional work habits and infractions of applicable regulations, "while deplorable,

do not amount to a violation of Title VII").[14]

Plaintiff also notes that around the time of Eid in 2011, he reported that

"someone had been deliberately tampering with [his] bicycle," which conduct he

interpreted as "a threat to my safety, also a common method of intimidation against

those who refuse to submit to Islamic religious culture."  (**Def. Motion App.**, Exh. 13 at

2-3; ***see also* Plf. Motion App.**, Exh. P.)  There is absolutely no evidence that anyone

associated with CDOT was responsible for or even remotely involved in this conduct.

Plaintiff's implicit suspicions as to any connection between the two does not constitute

evidence sufficient to present and preserve a genuine issue of material fact for trial.

Moreover, and despite plaintiff's characterization, there is no reasonable

interpretation by which any of the actions of which he complains could be construed as

"proselytizing," that is, as efforts "to convert or attempt to convert . . .; [or] recruit" others

to Islam. [15]  (***See* Dictionary.com** (available at

http://dictionary.reference.com/browse/proselytize?s=t) (last accessed October 26,

---

[14] Plaintiff's reliance on ***Sprague v. Adventures, Inc.***, 121 Fed. Appx 813 (10th Cir. Feb. 3, 2005) (per curiam), is frankly bizarre.  Despite the fact that the allegedly offending behavior in that case arguably was much more pronounced and severe – including a manager's overt proselytization, religious commentary and exhortation, and impromptu prayer sessions – the panel affirmed the district court's decision granting summary judgment.  ***See id.*** at 816-17.

[15] At the time, plaintiff asserted that other employees would not be able to attend if the luncheon was rescheduled.  He points to no evidence, however, showing that any other employees, in fact, were unable to attend

2012). Plaintiff did not attend either of the bagel breakfasts, and there is no other evidence suggesting that those events involved any form of proselytization. Nothing other than plaintiff's own *ipse dixit* supports his otherwise unsubstantiated belief that the mere fact of inviting others to share food around the end of Ramadan constitutes an attempt to "indoctrinate non-Muslims into the religious customs of Islam."[16] *Cf. EEOC v. Preferred Management Corp.*, 216 F.Supp.2d 763, 820-24 (S.D. Ind. 2002) (denying motion for summary judgment on hostile work environment claim where evidence demonstrated that "religious values, precepts, and practices were constituent elements of the very structure of the organization": company president openly espoused her religious beliefs, required employees to sign a document supporting the company's religiously oriented mission statement, and selected employees for management positions on the basis of their religious devotion).

"Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard. Some rolling with the punches is a fact of workplace life." *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008). Title VII protects workers from religious discrimination, but it does not mandate the completely religiously neutral work environment plaintiff apparently would prefer. *See Sprague*, 121 Fed. Appx. at 817 (Tymkovich, J., concurring) (noting difficulties in balancing "permissible religious commentary in the workplace" protected by the First Amendment with protections against religious discrimination of Title VII). That an employee occasionally

---

[16] Moreover, plaintiff presents no evidence, and the court finds it dubious at best, to suggest that any Islamic tradition involves the sharing of bagels and cream cheese.

may be confronted at work with religious beliefs or practices different from and offensive to his own does not make out a claim for a religiously hostile work environment, at least on the record before me here.  I thus find and conclude that plaintiff has failed to present a genuine issue of material fact, and thus, I grant defendant's motion for summary judgment on this claim.

## 2.  FAILURE TO ACCOMMODATE

Plaintiff argues next that defendant failed to reasonably accommodate his religious beliefs.  "Title VII imposes an obligation on the employer 'to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business.'"  ***Thomas v. National Association of Letter Carriers***, 225 F.3d 1149, 1155 (10th Cir. 2000) (quoting 29 C.F.R. § 1605.2(b)(1), (2) (1999)).  Plaintiff maintains that defendant failed to reasonably accommodate him by denying his request not to reschedule the 2010 employee appreciation luncheon.

I perceive at least two problems with this argument.  First, defendant's duty was to offer a reasonable accommodation, not necessarily the accommodation plaintiff would have preferred.  ***Ansonia Board of Education v. Philbrook***, 479 U.S. 60, 69 107 S.Ct. 367, 372, 93 L.Ed.2d 305 (1986); ***Cloutier v. Costco Wholesale***, 311 F.Supp.2d 190, 199 (D. Mass.), ***aff'd***, 390 F.3d 126 (1st Cir. 2004), ***cert. denied***, 125 S.Ct. 2940 (2005).  It clearly did so here, relieving plaintiff of his duties to organize and

advertise the luncheon.[17]

Second, only an accommodation that would not impose an undue hardship on the employer is required.  Plaintiff's preferred course – allowing the luncheon to go forward as originally scheduled, during Ramadan – would create an undue hardship by forcing defendant to trod on the religious beliefs of other of its employees in an effort to accommodate plaintiff.[18]  I cannot sanction such an absurd, unworkable, and potentially illegal result.  The employer must have some leeway to find a solution that best serves its obligations to accommodate the religious beliefs and practices of all its employees.

For these reasons, defendant is entitled to summary judgment on this claim.

### 3.  DISPARATE TREATMENT

Plaintiff maintains that defendant discriminated against him by giving preferential treatment to Muslims in the workplace.  The parties dispute whether the case should be analyzed under the standard burden-shifting analysis of ***McDonnell Douglas Corp. v. Green***, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed. 2d 668 (1973), or alternatively as a reverse discrimination case.[19]  Because I find that plaintiff has failed to show that

---

[17]  I note also that plaintiff did not initially inform Mr. Leonard of the religious nature of his objections to rescheduling the luncheon.  ***See Thomas***, 225 F.3d at 1155 ("Although the burden is on the employer to accommodate the employee's religious needs, the employee must make some effort to cooperate with an employer's attempt at accommodation.") (citation and internal quotation marks omitted).  As soon as plaintiff did so, Mr. Leonard relieved him of his responsibilities for coordinating the luncheon, i.e. accommodated him.

[18]  Nothing in the evidence suggests that the luncheon itself was a celebration of the Muslim holiday, and the mere fact that it was rescheduled to allow Muslim employees to participate does not alter the character of the event.  Moreover, although plaintiff argues that no other employee events were rescheduled in observance of other holidays, such as Lent, there is no evidence that any request for such an accommodation was ever made.

[19]  When a plaintiff is not a member of historically disfavored group, "the presumptions in Title VII analysis that are valid when a plaintiff belongs to a disfavored group are not necessarily justified:"

20

he suffered an adverse employment action – a requirement of the *prima facie* case under either rubric – I do not address that issue.

An adverse employment action is one that "is materially adverse to the employee's job status." ***Fischer v. Forestwood Co.***, 525 F.3d 972, 979 (10th Cir. 2008) (citation and internal quotation marks omitted). Although the action need not result in a "readily quantifiable loss[]," by the same token, "not everything that makes an employee unhappy is an actionable adverse action." ***MacKenzie***, 414 F.3d at 1279. Thus, a "[m]ere inconvenience or an alteration of job responsibilities" does not constitute an adverse employment action. ***Hillig v. Rumsfeld***, 381 F.3d 1028, 1031 (10th Cir. 2004).

Plaintiff claims that he suffered from adverse employment actions in that his job duties were changed, his security level was decreased, and he was left out of inter-office communications and denied information directly related to the performance of his job duties. (**Plf. Resp**. at 17.) To substantiate these allegations, plaintiff refers the court generally to his discovery responses, which themselves merely reiterate these

---

> [T]he presumption that unless otherwise explained, discrimination is more likely than not the reason for the challenged decision – is valid for a reverse discrimination claimant only when the requisite background circumstances exist. Thus, we agree that a Title VII disparate treatment plaintiff who pursues a reverse discrimination claim, and seeks to obtain the benefit of the ***McDonnell Douglas*** presumption, must, in lieu of showing that he belongs to a protected group, establish background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority.

***Notari v. Denver Water Department***, 971 F.2d 585, 589 (10th Cir. 1992) (citation and internal quotation marks omitted). Alternatively, a plaintiff may establish his *prima facie* case by "present[ing] direct evidence of discrimination or indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status the challenged employment decision would have favored the plaintiff." ***Id.*** at 590. In all events, the Tenth Circuit has noted that a plaintiff's burden in such a case is higher than in the typical Title VII action. ***See Adamson v. Multi Community Diversified Services, Inc.***, 514 F.3d 1136, 1141 (10th Cir. 2008).

same conclusory assertions.  (*See* **Def. Motion App.**, Exh. 14.)  In fact, defendant has presented evidence showing that the alleged change in plaintiff's job duties actually was nothing more than a semantical tweak in the description of plaintiff's position, the essential duties of which did not change.  (*See* **Def. Motion** at 16-17.)  That allegation, therefore, clearly does not support a finding of an adverse employment action.

The allegations regarding the change in plaintiff's security level and the denial of access to information refer to the fact that at some point during this time period, plaintiff no longer has access to employee personnel files.  (*See* **Def. Motion App.**, Exh. 3 at 178-179.)  Yet plaintiff acknowledged that he only had access to such information in his role as a back-up to Ms. Armendariz, and that his need for access to such files therefore was infrequent.  Although plaintiff testified that the lack of such access interfered with his ability to provide supervisors with information promptly, he identified no instance in which the lack of such access actually delayed the performance of his or a supervisor's duties, let alone that he suffered any detriment as a result of such restrictions.  (*See id.* at 186-187.)

In his deposition, plaintiff also alleged that he had been "left out of the loop" and got "strange looks from people" in the office.  (*Id.* at 180-181.)  "Coworker hostility . . . constitutes an adverse employment action only if it is sufficiently severe." ***Medina v. Income Support Division, New Mexico***, 413 F.3d 1131, 1136 (10th Cir. 2005).  In the absence of any further particulars, I cannot find that co-workers' unspecified "strange looks" are sufficient to constitute an adverse employment action.

Accordingly, defendant is entitled to summary judgment as to this claim as well.

## 4. RETALIATION

To state a claim for retaliation under Title VII, plaintiff must establish (1) that he engaged in protected opposition to discrimination; (2) that a reasonable employee would have found the challenged action materially adverse; and (3) that there exists a causal connection between his protected activity and the materially adverse action. ***EEOC v. PVNF, L.L.C.***, 487 F.3d 790, 803 (10th Cir. 2007). With regard to the second of these essential elements, "plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." ***Burlington Northern and Santa Fe Railway Co. v. White***, 548 U.S. 53, 68, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (citation and internal quotation marks omitted).

Even acknowledging that "material adversity is a broader standard" than that applied in determining the existence of an adverse employment action for purposes of a discrimination claim, ***see Barone v. United Airlines, Inc.***, 355 Fed. Appx. 169, 183 (10th Cir. Dec. 7, 2009), I cannot find that the standard is satisfied on the evidence presented here. Even considering the "constellation of surrounding circumstances, expectations, and relationships" at play in this matter, ***see Burlington Northern***, 126 S.Ct. at 2415, no reasonable jury could find that the relatively minor changes in job responsibilities and trivial frictions with co-workers that plaintiff experienced would have dissuaded a reasonable employee from making a charge of discrimination.

## IV.  CONCLUSION

Based on the foregoing analysis, I find and conclude that defendant is entitled to

summary judgment as to plaintiff's Title VII claims.  With respect to plaintiff's

constitutional and state law claims, as to which Eleventh Amendment immunity is

asserted, I will stay resolution of the issues inherent to the motion to dismiss, pending

submission by the parties of briefs limited to the specific issue whether CDOT is an arm

of the state.

## V.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That **Defendant's Memorandum Brief in Support of Combined Motion To

Dismiss and Motion for Summary Judgment** [#19], filed June 29, 2012, is **GRANTED

IN PART**;

2.  That the motion for summary judgment is **GRANTED**;

3.  That plaintiff's claims arising under Title VII for hostile work environment,

failure to accommodate, discrimination, and retaliation (the First, Second, and Seventh

Claims for Relief) are **DISMISSED WITH PREJUDICE**;

4.  That at the time judgment enters, judgment **SHALL ENTER** on behalf of

defendant, the Colorado Department of Transportation, against plaintiff, David C. Ross,

as to plaintiff's claims arising under Title VII for hostile work environment, failure to

accommodate, discrimination, and retaliation (the First, Second, and Seventh Claims for

Relief); and

5.  That the parties **SHALL SUBMIT** supplemental briefing, addressing the

discrete issue whether the Colorado Department of Transportation is an arm of the

state, according to the following schedule:

    a.  That defendant **SHALL FILE** a supplemental brief, not to exceed 15 pages,

by no later than **December 5, 2012**; and

    b.  That the deadlines for the filing of plaintiff's response, not to exceed 15 pages,

and defendant's reply, if any, not to exceed 10 pages, **SHALL BE** as prescribed by

**D.C.COLO.LCivR** 7.1C.

    Dated November 14, 2012, at Denver, Colorado.

                          **BY THE COURT:**

                          Robert E. Blackburn
                          United States District Judge